CLERK'S OFFICE U.S. DIST. COURT
AT CHARLOTTESVILE, VA
FILED

10/22/2019

JULIA C. DUDLEY, CLERK
BY: H. Wheeler
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

<table>
<tr><td>

IN THE MATTER OF THE SEARCH OF A
GOOGLE PIXEL CELLULAR PHONE,
BLACK IN COLOR WITH CRACKED
SCREEN AND NO VISIBLE
IDENTIFICATION MARKINGS,
CURRENTLY LOCATED AT 2211
HYDRAULIC ROAD, SUITE 201,
CHARLOTTESVILLE VA 22901

</td><td>

**Under Seal**

Case No. __3:19mj00057__

</td></tr>
</table>

**AFFIDAVIT IN SUPPORT OF AN
APPLICATION UNDER RULE 41 FOR A
WARRANT TO SEARCH AND SEIZE**

I, Robinson N. Blake, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application under Rule 41 of the Federal

Rules of Criminal Procedure for a search warrant authorizing the examination of property—an

electronic device— more fully described in Attachment A, which is currently in law enforcement

possession, and the extraction from that property of electronically stored information described

in Attachment B.

2.      I am a "federal law enforcement officer" within the meaning of Federal Rule of

Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal

laws and duly authorized by the Attorney General to request a search warrant.  I am a Special

Agent with the Federal Bureau of Investigation (FBI) and have been since March of 2009.  I am

currently assigned to the Richmond Division of the FBI, Charlottesville Resident Agency. My

principal duties include the investigation of various criminal violations, to include illegal

narcotics violations. In the course of my career with the FBI, I have been involved in the execution of numerous federal search warrants, including those for electronic devices.

3.      This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

### IDENTIFICATION OF THE DEVICE TO BE EXAMINED

4.      The property to be searched is a black Google Pixel Cellular Phone, with no visible serial number and a cracked screen, hereinafter the "Device." The Device is currently located at the FBI's Charlottesville Resident Agency, 2211 Hydraulic Road, Suite 201, Charlottesville, Virginia 22901.

5.      The applied-for warrant would authorize the forensic examination of the Device for the purpose of identifying electronically stored data particularly described in Attachment B.

### PROBABLE CAUSE

6.      The FBI and the Blue Ridge Task Force are investigating the distribution of controlled substances, including crack cocaine, in the area of Culpeper, Virginia, in the Western District of Virginia, by Lofton Lambert ("LAMBERT") and others.

7.      A review of Verizon Wireless records revealed that LAMBERT was the listed subscriber for cellular telephone number (540) 718-8973 ("LAMBERT's Mobile Number") as of February 11, 2019.

8.      On or about March 14, 2019, members of the Blue Ridge Task Force conducted a controlled purchase of suspected crack cocaine from Individual One ("IN-1") using a confidential informant ("CI-1"). Prior to the controlled purchase, CI-1 and IN-1 agreed on the amount of crack and where to meet. CI-1 and IN-1 met at the agreed upon location and CI-1 provided IN-1 with United States currency. IN-1 then left the presence of CI-1 and met with

2

LAMBERT.   After meeting with LAMBERT, IN-1 returned to CI-1 and provided CI-1 with suspected crack cocaine.

9.      A review of March 14, 2019 toll records for IN-1's telephone number revealed that this number sent/received approximately twelve (12) text messages with LAMBERT's Mobile Number around the time of the March 14, 2019 controlled buy.

10.      On or about April 9, 2019, members of the Blue Ridge Task Force conducted a controlled buy of suspected crack cocaine from IN-1 again using CI-1.  Prior to the controlled purchase, CI-1 and IN-1 agreed on the amount of crack and where to meet.  CI-1 and IN-1 met at the agreed upon location and CI-1 provided IN-1 with United States currency.  IN-1 left the presence of CI-1.  IN-1 returned to CI-1 and provided CI-1 with suspected crack cocaine.

11.      A review of April 9, 2019 toll records for IN-1's telephone number revealed that this number sent/received approximately six (6) text messages with LAMBERT's Mobile Number around the time of the April 9, 2019 controlled buy.

12.      On or about May 23, 2019, members of the Blue Ridge Task Force conducted a controlled buy of suspected crack cocaine from LAMBERT using a second confidential informant ("CI-2").  Prior to the controlled purchase, CI-2 and LAMBERT agreed on the amount of crack and where to meet.  CI-2 and LAMBERT met at the agreed upon location.  CI-2 provided LAMBERT with United States currency and LAMBERT provided CI-2 with suspected crack cocaine.  CI-2 communicated with LAMBERT on LAMBERT's Mobile Number to arrange this deal.

13.      On or about June 6, 2019, members of the Blue Ridge Task Force conducted a controlled purchase of suspected crack cocaine from LAMBERT using CI-2.  Prior to the controlled purchase, CI-2 and LAMBERT agreed on the amount of crack and where to meet.  CI-

3

2 and LAMBERT met at the agreed upon location.  CI-2 provided LAMBERT with United States currency and LAMBERT provided CI-2 with suspected crack cocaine.   CI-2 communicated with LAMBERT on LAMBERT's Mobile Number to arrange this deal.

14.     On or about June 20, 2019, members of the Blue Ridge Task Force conducted a controlled purchase of suspected crack cocaine from LAMBERT using CI-2.  Prior to the controlled purchase, CI-2 and LAMBERT agreed on the amount of crack and where to meet.  CI-2 and LAMBERT met at the agreed upon location.  CI-2 provided LAMBERT with United States currency and LAMBERT provided CI-2 with suspected crack cocaine.   CI-2 communicated with LAMBERT on LAMBERT's Mobile Number to arrange this deal.

15.     LAMBERT's criminal history includes a 2006 conviction for carrying a pistol without a license and possession with intent to distribute cocaine and PCP, a 2007 conviction possession with intent to distribute marijuana, and a 2008 conviction for possession with intent to manufacture/sell a schedule I or II drug.

16.     On September 17, 2019, a federal search warrant was obtained from United States Magistrate Judge Hoppe for historical and prospective location information from Verizon Wireless for LAMBERT's Mobile Number, Case No. 3:19-mj-00054.

17.     A review of the records obtained from the search warrant showed LAMBERT's Mobile Number traveling to various locations in and around the Culpeper, Virginia area.

18.     Records obtained from the search warrant showed that, on October 16, 2019, LAMBERT's Mobile Number was located in and around Silver Spring, MD. Through the course of the investigation, law enforcement suspected that this was the location of LAMBERT's source of supply for narcotics.

4

19.     Records obtained from the search warrant showed that, on October 16, 2019, LAMBERT's Mobile Number was traveling from Silver Spring, MD back in the direction of Culpeper, VA.

20.     On October 16, 2019, the Fauquier County Sheriff's Office ("FCSO") conducted a traffic stop of a Gold 2000 Chrysler Town & Country, Virginia License plate UTV-5707, driven by LAMBERT. An FCSO K9 officer conducted a free-air sniff around the vehicle, during which the K9 gave a positive alert for the odor of narcotics.  A subsequent search of the vehicle found approximately 19 ounces of cocaine powder and approximately $26,000 in United States currency. During the traffic stop, LAMBERT was found to be in possession of the subject Device. LAMBERT was arrested by FCSO for possession of cocaine with intent to distribute. Upon LAMBERT's arrest, the subject Device was seized by FCSO. LAMBERT is currently incarcerated pending trial.

21.     I believe the subject Device is the same device utilizing LAMBERT's Mobile Number and therefore is likely the device LAMBERT used to coordinate the aforementioned illegal narcotics sales. I also believe, based on LAMBERT's criminal history and other facts presented in this affidavit, that the Device has been utilized by LAMBERT in relation to other illegal narcotics sales not yet known to law enforcement.

22.     The Device is currently in the lawful possession of the Federal Bureau of Investigation (FBI).  The FBI took custody of the Device from FCSO on October 17, 2019. Therefore, while the FBI might already have all necessary authority to examine the Device, I seek this additional warrant out of an abundance of caution to be certain that an examination of the Device will comply with the Fourth Amendment and other applicable laws.

23.     The Device is currently in storage at the FBI's Charlottesville Resident Agency,

2211 Hydraulic Road, Suite 201, Charlottesville, Virginia 22901.  In my training and experience,

I know that the Device has been stored in a manner in which its contents are, to the extent

material to this investigation, in substantially the same state as they were when the Device first

came into the possession of the FBI.

24.     Based on my training and experience, I know that people who sell or distribute

controlled substances will utilize cell phones as a method of maintaining contact with their

suppliers, customers and co-conspirators. They will use cell phones to send and receive text

message, e-mails, photographs, videos and other digital and electronic data that pertains to their

drug trafficking activities. I know that cell phones store data for long periods of time and through

use of forensic tools deleted data can be recovered from them.

## TECHNICAL TERMS

25.     Based on my training and experience, I use the following technical terms to

convey the following meanings:

     a.   Wireless telephone:  A wireless telephone (or mobile telephone, or cellular

         telephone) is a handheld wireless device used for voice and data communication

         through radio signals.  These telephones send signals through networks of

         transmitter/receivers, enabling communication with other wireless telephones or

         traditional "land line" telephones.  A wireless telephone usually contains a "call

         log," which records the telephone number, date, and time of calls made to and

         from the phone.  In addition to enabling voice communications, wireless

         telephones offer a broad range of capabilities.  These capabilities include: storing

         names and phone numbers in electronic "address books;" sending, receiving, and

storing text messages and e-mail; taking, sending, receiving, and storing still

photographs and moving video; storing and playing back audio files; storing

dates, appointments, and other information on personal calendars; and accessing

and downloading information from the Internet.  Wireless telephones may also

include global positioning system ("GPS") technology for determining the

location of the device.

b.  Digital camera:  A digital camera is a camera that records pictures as digital

picture files, rather than by using photographic film.  Digital cameras use a

variety of fixed and removable storage media to store their recorded images.

Images can usually be retrieved by connecting the camera to a computer or by

connecting the removable storage medium to a separate reader.  Removable

storage media include various types of flash memory cards or miniature hard

drives.  Most digital cameras also include a screen for viewing the stored images.

This storage media can contain any digital data, including data unrelated to

photographs or videos.

c.  Portable media player:  A portable media player (or "MP3 Player" or iPod) is a

handheld digital storage device designed primarily to store and play audio, video,

or photographic files.  However, a portable media player can also store other

digital data.  Some portable media players can use removable storage media.

Removable storage media include various types of flash memory cards or

miniature hard drives.  This removable storage media can also store any digital

data.  Depending on the model, a portable media player may have the ability to

store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.  GPS:  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or locations involved in such navigation.  The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.  PDA:  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.  Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can store any digital data.  Most PDAs run computer

8

software, giving them many of the same capabilities as personal computers. For

example, PDA users can work with word-processing documents, spreadsheets,

and presentations. PDAs may also include global positioning system ("GPS")

technology for determining the location of the device.

f.  Tablet: A tablet is a mobile computer, typically larger than a phone yet smaller

than a notebook, that is primarily operated by touching the screen. Tablets

function as wireless communication devices and can be used to access the Internet

through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets

typically contain programs called apps, which, like programs on a personal

computer, perform different functions and save data associated with those

functions. Apps can, for example, permit accessing the Web, sending and

receiving e-mail, and participating in Internet social networks.

g.  Pager: A pager is a handheld wireless electronic device used to contact an

individual through an alert, or a numeric or text message sent over a

telecommunications network. Some pagers enable the user to send, as well as

receive, text messages.

h.  IP Address: An Internet Protocol address (or simply "IP address") is a unique

numeric address used by computers on the Internet. An IP address is a series of

four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).

Every computer attached to the Internet computer must be assigned an IP address

so that Internet traffic sent from and directed to that computer may be directed

properly from its source to its destination. Most Internet service providers control

a range of IP addresses. Some computers have static—that is, long-term—IP

9

addresses, while other computers have dynamic—that is, frequently changed—IP

addresses.

    i.   Internet: The Internet is a global network of computers and other electronic

        devices that communicate with each other.  Due to the structure of the Internet,

        connections between devices on the Internet often cross state and international

        borders, even when the devices communicating with each other are in the same

        state.

26.     Based on my training, experience, and research, I know that the Device has

capabilities that allow it to serve as a wireless telephone, digital camera, portable media player,

GPS, personal digital assistant and access the internet.  In my training and experience, examining

data stored on devices of this type can uncover, among other things, evidence that reveals or

suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

27.     Based on my knowledge, training, and experience, I know that electronic devices

can store information for long periods of time. Similarly, things that have been viewed via the

Internet are typically stored for some period of time on the device.  This information can

sometimes be recovered with forensics tools.

28.     *Forensic evidence.*  As further described in Attachment B, this application seeks

permission to locate not only electronically stored information that might serve as direct

evidence of the crimes described on the warrant, but also forensic evidence that establishes how

the Device was used, the purpose of its use, who used it, and when.  There is probable cause to

believe that this forensic electronic evidence might be on the Device because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

29.     *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent

11

with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

30.     *Manner of execution.*  Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

31.     I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Device described in Attachment A to seek the items described in Attachment B.

## OATH

The information in this affidavit is true to the best of my knowledge and belief.

Respectfully submitted,

*s/Robinson N. Blake*
Robinson N. Blake, Special Agent
Federal Bureau of Investigation

Received by reliable electronic means and sworn and attested to by telephone on this __22nd__ day of October 2019.

JOEL C. HOPPE
UNITED STATES MAGISTRATE JUDGE

12